JUDGE ABRAMS

15 CV 4167

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

FRANCOIS D'ANJOU

                Plaintiff,

    -against-

LIFE TIME FITNESS, INC.,

                Defendant.

-----------------------------------------------------------x

1:15-cv-04167-RA

**COMPLAINT**

PLAINTIFF DEMANDS A
TRIAL BY JURY

RECEIVED
MAY 29 2015
U.S.D.C. S.D.N.Y.

Plaintiff, Francois D'Anjou, by his attorney, alleges for his Complaint as follows:

## PARTIES

1. Mr. Francois D'Anjou ("**Plaintiff**" or "**Mr. D'Anjou**") is a natural person residing in Cliffside, New Jersey.

2. Upon information and belief, Life Time Fitness, Inc. ("**Life Time**" or "**Defendant**"), is a domestic corporation, incorporated under the laws of Minnesota, headquartered in Chanhassen, Minnesota, employing more than 24,600 employees in two nations, and regularly doing business in brick-and-mortar locations throughout New York.

## JURISDICTION AND VENUE

3. Jurisdiction is founded upon 28 U.S.C. § 1331 and principles of supplemental jurisdiction under 28 U.S.C. §1367.

4. Plaintiff filed a Charge of discrimination with the Equal Employment Opportunity Commission ("**EEOC**") on July 18, 2014 and it was stamped received by the EEOC on July 28, 2014. The EEOC is currently investigating the Charge, Plaintiff has *not* received

1

a *Notice of Right to Sue* letter, and Plaintiff intends to respectfully seek leave to amend his complaint to add Title VII claims at an appropriate time.

5. Federal question jurisdiction rests with this Court under 42 U.S.C. §1981.

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred within the Southern District of New York.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

7. Mr. D'Anjou was employed by Life Time from on or around October 1, 2013 until his wrongful termination on or around July 1, 2014.

8. Mr. D'Anjou is an African-American ("**African-American**" or "**black**") male with a brown skin complexion and belongs to this protected class of race.

9. At all pertinent times Mr. D'Anjou was fit, qualified, and eager to hold a position at Life Time, and performed his duties in a professional and competent manner.

10. Upon information and belief, at all pertinent times, Defendant acted or failed to act by and through its duly authorized agents, servants, representatives, partners, manager, supervisors and employees, who conducted themselves within the scope and course of their employment, with intentional malice and/or with reckless disregard to Mr. D'Anjou's federal and New York rights.

11. From the start of Mr. D'Anjou's employment until he was wrongfully terminated, he was charged with building and maintaining a productive Life Time store team.

12. Mr. D'Anjou—a seasoned veteran of the salon and fitness industry—brought years of experience and built a productive team at his location.

13. Mr. D'Anjou—again because of his years of experience in the industry—was even able to pull multiple successful and highly desirable employees from competitor companies. In short, Mr. D'Anjou in the short-term built a team and in the long-term set-up his team to grow and thrive—as soon as various legal and noncompete issues resolved.

14. On or around May 15, 2014, Life Time Fitness rolled out a national campaign featuring "LT Bucks," which is essentially Life Time currency valid in Life Time stores only.  For real world purposes LT Bucks are worth what Monopoly money is worth: nothing.

15. Life Time management instructed all managers in general, and Mr. D'Anjou specifically, to push LT Bucks as a way or developing new clients and expanding the services existing clients utilize.

16. This new campaign was not a nonchalant 'if you can' directive from management. Instead, all store managers were supposed to seriously push LT Bucks.  As far as Life Time management was concerned, the more LT Bucks bookings, the better.

17. Mr. D'Anjou was so effective a manager at personally, and through his staff, pushing LT Bucks that LT Bucks quickly took over a significant portion of his bookings and revenue.

18. Unbeknownst to Mr. D'Anjou—as management failed to disclose—LT Bucks do not count toward a store's revenue for internal performance purposes.

19. Mr. D'Anjou is not naïve or ignorant in business, and he knew LT Bucks are not real currency in a meaningful sense.  But Mr. D'Anjou contemplated that Life Time was taking a short-term revenue hit, investing in its clients and the company, and taking a long-term view that ultimately would grow the company and bring in more real dollars. This campaign was about branding, and Mr. D'Anjou was determined to roll-out the campaign as successfully as possible.

20. In fact, Mr. D'Anjou was so successful at marketing LT Bucks that his store nationally recorded the second-highest redemption level. Plaintiff is unsure whether this was second-highest in terms of sheer volume, or as a proportion of the respective store's budget, but the underlying fact remains that LT Bucks displaced a substantial portion of Mr. D'Anjou's store's revenue.

21. Curiously, subsequent to the campaign roll-out announcement, management informed other similarly situated, non-protected class members that LT Bucks do not count toward internal revenue numbers and performance.

22. On or around June 4, 2014, Life Time Fitness issued a Performance Improvement Plan ("**PIP**") to Mr. D'Anjou for failure to hit his revenue and performance numbers.

23. Life Time unfavorably manipulated Mr. D'Anjou's financial numbers by, *inter alia*, failing to credit LT Bucks up unto the point that Mr. D'Anjou was informed LT Bucks do not count towards revenue and performance numbers.

24. Upon information and belief, Life Time favorably manipulated other stores' subpar revenue and performance financial numbers so those stores appeared to hit budget when, in fact, those stores were not hitting budget—such as the Berkeley Heights store.

25. Life Time treated other similarly situated, nonprotected class managers more favorably by, *inter alia*, not issuing a Performance Improvement Plan (PIP) to those managers with comparatively bad revenue and bad profit margins. For Life Time, what was good for the goose was not good for the gander.

26. Life Time failed to provide adequate budget accommodations to comply with New York Labor Laws and held Mr. D'Anjou responsible for trying to comply with meal break and other labor law restrictions.

27. Throughout his career at Life Time, Mr. D'Anjou was vigilant in following New York and Federal law, including health laws because nail salons and spas can be vectors of disease in particular because of the large customer base and intimate nature of services. Without putting too fine a point on it, even a standard and professional manicure or pedicure can cause a client to bleed.

28. In light of the serious threat communicable diseases, particularly blood-borne diseases, pose to the general public the New York State legislature has adopted strict health codes for the sterilization of utensils, training of employees, and set-up of stations (Article 27 N.Y. Gen. Bus. Stat. §404). In short, without adherence to the New York Secretary's health rules and regulations, informed by and based on medical and communicable disease science, a simple manicure or pedicure can turn real nasty, real quickly.

29. On or around June 21, 2014, Mr. D'Anjou learned (via pictures posted by Supervisor/Manager Ms. Susan Mistri) that nail technicians were providing pool-side and otherwise non-station manicures, pedicures and nail-work for paying clients of the public, which was (illegally) implemented and countenanced by Life Time management—though not Mr. D'Anjou.

30. Importantly, Ms. Mistri authorized this (illegal) activity for crass and callous business purposes. In particular, when technicians do not have a client, Ms. Mistri desired technicians to "prospect" by going to the pool area of the spa to offer manicures and pedicures, or demonstrations, to drum up paying business.

31. While a client—likely unaware of the serious health risks—might enjoy pool-side nail-work, Life Time breached the New York Secretary's health rules and regulations and

unfortunately posed a serious health risk to the employees, clients, and general public should a communicable disease transmit.

32. Upon Mr. D'Anjou's scheduled return to work, some of the technicians complained to Mr. D'Anjou who had never allowed pool-side work and who thought it was too hot, too unsanitary, and too messy and nasty to perform manicures and pedicures away from their authorized and proper work stations.

33. Mr. D'Anjou inquired with the Department of Labor whether or not such pool-side activity might be permissible, and Mr. D'Anjou was told an unequivocal and resounding "No!" by the representative on the phone.   Upon information and believe the representatives first name was Ann.

34. Mr. D'Anjou engaged in protected activity when he wrote an email to Life Time managers, apprising them of the health risks, informing them of the information he anonymously obtained from the Department of Labor, and seeking counsel as to whether this practice should occur in the future or whether pool-side manicures and pedicures are impermissible.

35. As soon as the email was sent, Ms. Mistri burst into the room Mr. D'Anjou was in and started reprimanding him for sending the email and stating "I said the [pool-side] manicures and pedicures are fine, it's no big deal, you can't write that?" Mr. D'Anjou again engaged in protected activity by stating that he and the Department of Labor thought it was a breach of New York rules and regulations and a serious threat to public health.  He also objected and stated he wanted no part of pool-side nail-work.

36. Subsequently, Ms. Mistri attempted to walk-back her earlier unequivocal and clear statements by claiming to upper management she had only permitted nail polishing poolside, and not manicures, pedicures, or other such nail work.

37. In or around June 2014, Mr. D'Anjou engaged in protected activity when he wrote another email to HR and complained orally in person to Supervisor/Manager Ms. Susan Mistri that he felt the PIP was the result of harassment and discrimination because he was African-American.

38. Ms. Mistri's response to Mr. D'Anjou was, in substantial form: "don't write it down in email and document things like this [Title VII protected activity], instead pick up the phone to say your complaints."

39. After certain Life Time managers sand-bagged Mr. D'Anjou by cooking the financial books, and faced with a trumped-up and pretextual PIP threatening termination, Mr. D'Anjou again engaged in protected activity and complained to high level Life Time executive Mr. John Riley (Caucasian) in or around June 2014 that he thought the harassment and PIP were a result of mistreatment because of his race and that he was therefore being treated unfairly.

40. Mr. Riley, perhaps surprisingly since Mr. D'Anjou is before this Court seeking redress, agreed with Mr. D'Anjou. After hearing Mr. D'Anjou's protected activity in the form of a verbal complaint Mr. Riley responded, in substantial form, "this is wrong [the PIP]. You shouldn't be on a PIP, and you certainly shouldn't be facing a 30 day [revenue] deadline [in light of the LT Bucks debacle]."

41. Mr. Riley promised Mr. D'Anjou he would take care of the deadline and PIP.

42. Unsurprisingly, and for unknown reasons, Mr. Riley never resolved the deadline and PIP issue, and as simple as that Ms. Mistri and Mr. Sussman—agents acting within their authority on behalf of Life Time—terminated Mr. D'Anjou under the pretext of poor financial performance and PIP noncompliance.

43. Throughout June 2014, Life Time was in facial noncompliance with the very PIP it issued by failing to counsel Mr. D'Anjou as the PIP promised.

44. Mr. D'Anjou's status as a black person and/or as a person engaging in protected activity was a motivating and/or but-for factor for the adverse employment action(s) Life Time interposed.

45. Life Time Fitness Manager Brian Sussman further retaliated against Mr. D'Anjou when he spoke-ill and otherwise bad-mouthed Mr. D'Anjou in front of dozens of employees at a staff meeting In or around August 2014.

**FIRST CLAIM**
(Race/Color Discrimination
Arising Under Section 1981)

46. Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

47. Plaintiff belongs to the historically disadvantaged racial minority protected-class of black/African-American.

48. American Airlines treated Mr. D'Anjou differently—and indeed much less favorably—than similarly situated nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, *inter alia*, failing to properly train Plaintiff, failing to timely inform Plaintiff of the consequences of LT Bucks for revenue and performance purposes, failing to provide an adequate budget to comply with New York Labor Laws, failing to properly review his store's revenue and profit margins in light of the national

8

LT Bucks campaign and/or relevant factors such as the company's failure to allow one room to be utilized in his store, noncompete issues, and new team development issues, properly reviewing and taking into consideration other similarly situated nonprotected class employee store managers' revenue and profit margins, pretextually issuing a Performance Improvement Plan (PIP) to railroad Plaintiff out the door, failing to comply with the facial requirements of the PIP for reviewing and addressing the alleged performance issue, failing to remove and/or extend the PIP deadline as confirmed by executive John Riley, failing to consider the high performing team Plaintiff created, sustained and coordinated, and other improper considerations and treatment concerning Plaintiff and his performance.

49. Defendant's discriminatory and disparate treatment of Plaintiff because of his race as an African-American/black employee was in violation of 42 U.S.C. § 1981, among other provisions.

50. Defendant's actions were done intentionally or with reckless indifference to Plaintiff's federally protected rights.

51. As a direct and proximate result of intentional and/or reckless Defendant's actions, Plaintiff was terminated or otherwise not allowed to work, and suffered lost wages and benefits, as well as humiliation, inconvenience, mental distress, and embarrassment.

52. Section 1981 has no condition precedent or administrative exhaustion requirement prior to lawsuit, and all alleged acts of discrimination for this cause of action occurred within four (4) years of the date of this lawsuit's filing. The most favorable construction of the relevant statute of limitations would be Mr. D'Anjou's start date in October 1, 2013,

creating a statute of limitations deadline of October 1, 2017. This lawsuit was filed in May 2015, and this claim is indisputably timely.

**SECOND CLAIM**
(Protected Activity Retaliation
Arising Under Section 1981)

53. Plaintiff incorporates by reference all preceding paragraphs as if re-alleged and stated fully herein.

54. Plaintiff belongs to the historically disadvantaged protected-class of African-American/black, and is precisely the race this legislation was originally codified to protect.

55. Defendant disparately treated, discriminated against, and retaliated against Plaintiff and otherwise materially affected Mr. D'Anjou's ability to make and enforce contracts on an equal footing as white citizens in violation of 42 U.S.C. § 1981.

56. American Airlines treated Mr. D'Anjou differently—and indeed much less favorably—than similarly situated nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, *inter alia*, failing to properly train Plaintiff, failing to timely inform Plaintiff of the consequences of LT Bucks for revenue and performance purposes, failing to provide an adequate budget to comply with New York Labor Laws, failing to properly review his store's revenue and profit margins in light of the national LT Bucks campaign and/or relevant factors such as the company's failure to allow one room to be utilized in his store, noncompete issues, and new team development issues, properly reviewing and taking into consideration other similarly situated nonprotected class employee store managers' revenue and profit margins, pretextually issuing a Performance Improvement Plan (PIP) to railroad Plaintiff out the door, failing to comply

with the facial requirements of the PIP for reviewing and addressing the alleged performance issue, failing to remove and/or extend the PIP deadline as confirmed by executive John Riley, failing to consider the high performing team Plaintiff created, sustained and coordinated, retaliating against Mr. D'Anjou for numerous written and oral protected activity complaints alleging the harassment and otherwise disparate and discriminatory treatment was the result of his status as an African-American/black employee, reprimanding his reducing discrimination complaints to email and instructing him to complain in the much less documented means of oral/informal complaints, and other improper considerations and retaliation concerning Plaintiff and his performance.

57. Defendant's discriminatory and retaliatory actions caused Mr. D'Anjou to be unable to make, perform, and/or modify the contract between him and the Defendant. Moreover, Defendant's discriminatory and retaliatory actions prevented Mr. D'Anjou from enjoying all of the benefits, privileges, terms and conditions of the contractual relationship between the parties.

58. Only federal defendants are, as a general matter, immune from 1981 actions. State and private employers are subject to 1981 actions generally, and Life Time Fitness is indisputable a private employer for Section 1981 purposes.

59. Defendant's actions were done intentionally and/or with reckless indifference to Plaintiff's federally protected rights.

60. As a direct and proximate result of Defendant's actions, Plaintiff was terminated or otherwise suffered an adverse employment action(s), and suffered lost wages and benefits, as well as humiliation, inconvenience, mental distress, and embarrassment.

61. 42 U.S.C. § 1981 grants Mr. D'Anjou a right to recovery for retaliation, and Plaintiff is not complaining of an unlawful employment practice that is unlawful because of its disparate impact.

62. Section 1981 has no condition precedent or administrative exhaustion requirement prior to lawsuit, and all alleged acts of retaliation for this cause of action occurred within four (4) years of the date of this lawsuit's filing.  The most favorable construction of the relevant statute of limitations would be Mr. D'Anjou's start date in October 1, 2013, creating a statute of limitations deadline of October 1, 2017.  This lawsuit was filed in May 2015, and this claim is indisputably timely.

63. There exist no statutory damage caps on Section 1981 actions.

**THIRD CLAIM**
(Whistleblower Retaliation Arising Under
New York Labor Law Section 740)

64. All preceding paragraphs are incorporated by reference as if fully stated herein.

65. Section 740 of New York Labor Law is known as the "whistle blower" statute and is designed to protect employees from retaliation from their employers when such employee exposes or threatens to expose a danger to the public health or safety (NYLL 740(2)(a) disclosing and NYLL 740(2)(c) objecting to such activity).

66. Mr. D'Anjou was an "employee" within the meaning of NYLL 740 because he was an individual who performed services for and under the control and direction of an employer for wages and remuneration.

67. Life Time Fitness was an "employer" within the meaning of NYLL 740 because Life Time is a corporation that employs employees.

68. Mr. D'Anjou suffered a retaliatory personnel action because he suffered a discharge and/or otherwise adverse employment action in the context of his terms and conditions of employment.

69. Mr. D'Anjou disclosed, whistle blew and objected to his "supervisors" within the meaning of NYLL 740 because Ms. Susan Mistri, Mr. Brian Sussman, and other managers he wrote the email to and complained to orally had the power to hire and fire him, with direct control over his work performance and/or who had the authority to direct and control Mr. D'Anjou's work performance or issue corrective action regarding the violation of the law, rule or regulation of which he complained.

70. Mr. D'Anjou blew the whistle and disclosed the pool-side manicures, pedicures and nail work by email and orally to the Department of Labor, management and supervisors.

71. Specifically, Life Time Fitness violated numerous New York State rules and regulations including, *inter alia*, 19 CRR-NY 160.11(a)-(b) in failing to ensure proper conduct and compliance with statutory and regulatory requirements, 19 CRR-NY 160.16 (a)-(e) in failing to provide hot and cold running water, wash basins for use by client and employee, proper illumination for the safe provision of licensed services, covered containers for waste material, and a sufficient working area to ensure the safety and health of both the technician and client, 19-CRR-NY 160.17(e) in failing to proper transport "clean" and "dirty" equipment to and from remote locations.

72. In addition, Life Time violated, *inter alia*, the New York State Uniform Code, New York State Sanitary Code, the State Industrial Code, and other relevant law, rule, or regulation, whether state, federal or other.

73. Mr. D'Anjou was not whistleblowing about tax or billing matters.  Instead, Mr. D'Anjou whistle blew about a *substantial* and *specific* public health and safety matter.  Such specific dangers to the public health and safety included long-term and incurable disease transmission such as Hepatitis C, HIV (the virus that causes AIDS), and other specific blood borne illnesses could have been transmitted as a direct and proximate result of improper facilities, sterilization, transportation of materials and unsanitary working conditions inherent in pool-side nail work.

74. As a direct and proximate result of Defendant's actions, Plaintiff was terminated or otherwise not allowed to work, and suffered lost wages and benefits, as well as humiliation, inconvenience, mental distress, and embarrassment.

75. NYLL 740(4)(a) provides a one year statute of limitations to file a civil action, Mr. D'Anjou suffered retaliatory action at the earliest on or around June 2014, and this action filed in May 2015 is indisputable timely.

76. Mr. D'Anjou was not an "independent contractor" for purposes of NYLL 740.

    **WHEREFORE**, Mr. D'Anjou respectfully demands judgment against Life Time Fitness, Inc., as follows:

    **A.** On his First Claim, back pay and front pay in amounts as yet undetermined (including benefits and wage supplements), compensatory damages and punitive damages to the maximum extent permissible by law, attorneys' fees, interest, and costs;

    **B.** On his Second Claim, back pay and front pay in amounts as yet undetermined (including benefits and wage supplements), compensatory damages and punitive damages to the maximum extent permissible by law, attorneys' fees, interest, and costs;

**C.** On his Third Claim, back pay and front pay in amounts as yet undetermined (including benefits and wage supplements), compensatory damages to the maximum extent permissible by law, attorneys' fees, interest, and costs.

JURY TRIAL DEMANDED
ATTORNEY'S LIEN CLAIMED

**Dated: New York, New York**
**May 27, 2015**

Respectfully submitted,

By:  s/ Jeffrey D. Jones
Jeffrey D. Jones, NY #4843363
THE JONES LAW FIRM
523 East Pine Place
Tulsa, OK 74106-4301
Phone: (574) 876-4715
www.JeffreyJonesLawFirm.com
JJ@JeffreyJonesLawFirm.com

*Attorney for Plaintiff*
*Francois D'Anjou*

15